OPINION OF THE COURT
Rena K. Uviller, J.
When a search warrant authorizes seizure of specific documents, how extensively may the executing officers scrutinize the documents to determine if they fall within the warrant’s ambit. If the papers are not specified in the warrant, to what extent may they be examined to assess their value as evidence in the case such as to fall within the "plain view” exception to the warrant requirement.
Defendants have been indicted for conspiracy to commit murder, and attempted murder. It is alleged that the two conspired to arrange for the contract killing of defendant Tina Shepard’s estranged husband, Ray Shepard.
Defendant Tina Shepard was arrested on May 8, 1995 after leaving a meeting with an undercover police officer who had been posing as a hit man. Later that day, Detective James Serra of the 9th Precinct obtained a warrant authorizing the search of an apartment in Brooklyn where Ms. Shepard cohabited with codefendant Eduardo Avila, Jr., a New York City police officer. The warrant was executed in the early morning hours of May 9, 1995. (Defendant Avila was arrested after a Grand Jury returned an indictment against him in January 1996.)
Defendants have moved to suppress various items recovered during execution of the search warrant on the grounds that these items were not enumerated in the warrant. At the hearing to address this claim Detective James Serra was the sole witness. Based on his credible testimony, the following findings and conclusions are entered.
DETECTIVE SERRA’S FAMILIARITY WITH THE CASE
Serra had learned from informant Jeffrey Puritis that defendant Tina Shepard had approached Puritis on April 29 and again on April 30, 1995, soliciting his services to kill her husband, Ray Shepard, a naval officer who lived in Virginia Beach, Virginia. Puritis reported Shepard’s request to the police and claimed to have no knowledge of how Ms. Shepard came to identify him as a candidate for this mission. The police arranged for Puritis to introduce Ms. Shepard to a new applicant for the hit man position, this time an undercover officer.
*519 Ms. Shepard met with the undercover officer at the South Street Seaport on May 4 and May 8, 1995, contracting with him to have her husband killed (and her children seized and returned to her) in exchange for money; she gave the undercover $2,500 as a down payment. ■
Both Puritis and the undercover advised Detective Serra that Tina Shepard had displayed and/or given to them certain documents, letters, papers and photographs to aid them in identifying and locating the intended victim, Ray Shepard, in Virginia Beach, Virginia. She also showed them documents to substantiate her claims that her husband had abused her and that they were engaged in litigation over a divorce and custody of their small children. She had told both Puritis and the undercover that she needed Mr. Shepard killed by May 12, the date scheduled for a custody hearing in Virginia.
Detective Serra had also obtained information from various sources that Ms. Shepard and codefendant Avila cohabited at 118 Union Street in Brooklyn. Although the extent of Officer Avila’s involvement in the contract killing was uncertain, detectives had learned that Avila was the owner of a gun found by Ray Shepard in his Virginia Beach house in 1994. The gun had been returned to New York, where Officer Avila regained possession of it. Other information suggested that Avila had driven Ms. Shepard to one of her meetings with Puritis.
Also, as the presumed paramour of Ms. Shepard, Officer Avila was viewed as a possible source of funds paid and promised by Ms. Shepard to the hit man.
EXECUTION OF THE WARRANT
The items the officers were looking for as set forth in the search warrant included maps, diagrams, and photos that would aid the hit man in locating and identifying Ray Shepard and his Virginia Beach home; bankbooks and other financial documents in the name of Shepard or Avila that might indicate the source of funds to pay the hit man; complaint reports to Virginia police by and about Tina and Ray Shepard and court documents and correspondence between Tina and Ray that evidence their marital discord and the custody and divorce proceedings that provided the presumed motivation for the killing of Ray Shepard.
Entering the bedroom occupied by Avila and Shepard, Detective Serra saw it was in total disarray, with clothing and papers strewn on the bed and numerous items on the bedside table. Approaching that table, Serra saw a handwritten note on po *520 lice department notepaper (exhibit No. 2). Before he could pick it up Avila, who was present during the execution of the warrant, snatched it away and attempted to conceal it. Serra retrieved the note and read it. The two page document was marked 11:30 p.m. at the top, began with a reference to "Tina,” mentioned "Ray,” and was signed "Ed.” Detective Serra deduced from the 11:30 p.m. notation that it had just recently been composed by Avila and from his initial cursory perusal believed it to be a suicide note. He seized it because he believed it constituted incriminating evidence of Avila’s relationship with Tina Shepard, his hostility to Ray Shepard and his consciousness of guilt.
On the bed Detective Serra saw a compilation of documents which he immediately recognized as a New York City Police Department "arrest package”. In a brief glance he saw that it related to an arrest by Officer Avila of Jeffrey Puritis, the confidential informant. Detective Serra instantly concluded that this constituted the probable, hitherto unknown, link between defendant Tina Shepard and Puritis and seized it.
Detective Serra also seized numerous documents and letters which were found in either the bedroom shared by defendants or in the living room on a large table covered with papers. In each case, after an initial cursory perusal, Detective Serra concluded that the paper or document either fell within the categories of items specified in the search warrant, or that it was apparent that the document constituted evidence. These included letters from and to Tina Shepard’s divorce lawyer, copies of a domestic partnership agreement between Tina Shepard and Eduardo Avila, and Navy Department letters relating to an alleged assault upon Tina Shepard by Ray Shepard.
CONCLUSIONS
Under the plain view doctrine, the police may seize evidence in plain view, provided that they are lawfully in a position to see the item, have lawful access to the item, and the item’s incriminating nature is " 'immediately apparent’ ” (Horton v California, 496 US 128, 136, 137; see, People v Diaz, 81 NY2d 106). Thus, officers executing a warrant to search for specified items may seize items not described in the warrant if they were discovered in the course of their search, as long as it is "immediately apparent” that the item constitutes incriminating evidence. (Horton v California, supra.)
*521 THE "SUICIDE note”
As to exhibit No. 2, the letter attributed to defendant Avila and characterized by Detective Serra as a suicide note, defendant asserts that its import could not be determined without a thorough reading and studied reflection; that the detective was not entitled to undertake such a study and analysis once an initial inspection revealed that the letter was not one of the documents described in the warrant.
Inspection of an item, and especially a document, need not terminate immediately upon an initial glance indicating that it is not specified by the warrant. (See, 2 LaFave, Search and Seizure § 4.11 [d], at 700-701 [3d ed 1996].) Defendant’s reliance upon People v Basilicato (64 NY2d 103) is misplaced. In that case police obtained a warrant authorizing wiretapping of a telephone line. In the course of their authorized monitoring of phone conversations they also overheard nontelephonic conversations in the home where the phone was located, which became audible when the phone was left off the hook. The Court of Appeals held that the overheard nontelephonic conversations were inadmissible because nontelephonic eavesdropping was not authorized under relevant statutory provisions.
Basilicato (supra) also determined that the "plain view” doctrine was inapplicable because that doctrine requires that the police have a legitimate reason for being present, that is, a prior justification for being in the position where they were able to observe or detect the evidence in plain view. Since the officers were not authorized to eavesdrop, they were not legitimately in a position to overhear the nontelephonic conversations and were obliged to terminate their surveillance once it became apparent that what they were overhearing was not telephonic conversation.
Basilicato (supra) does not apply to a situation, like this one, where the police were legitimately in the apartment, were authorized to seize numerous documents, and were able to observe the item in plain view on the bedside table. In such a case, they are not obliged to cease inspection the moment they realize the item is not within the warrant, so long as it is immediately apparent that it is incriminating.
Defendants also seek to impose a requirement that the officer’s perception that the document is incriminating be virtually instantaneous upon first glance. Thus, in the case of a letter, document, or other writing defendants urge that an officer *522 is not permitted to go beyond the most superficial glance, and may not proceed to read the document.
How closely or intensively an officer may inspect an item not named in the warrant must vary with the circumstances of the case, the scope of the search authorized by the warrant, and the nature of the item to be seized. Both law and logic suggest that when officers are authorized by the warrant to search for and seize documents and writings, that authorization necessarily implies authority to conduct a sufficient scrutiny of any writings they find in order to determine whether they come within the scope of the warrant. Should that initial inspection reveal that the document, while not described in the warrant, is clearly incriminatory, it is subject to further scrutiny and seizure.
This case is thus distinguishable from the handful of New York cases which have held that books or papers were unlawfully seized because their incriminatory nature was not "immediately apparent.” (See, People v Etoll, 51 NY2d 840 [police officers executing arrest warrant for a defendant charged with prostitution seized ledger with no outward indications of contents]; People v Rivas, 214 AD2d 996 [police executing search warrant in drug case seized fragments of paper that had to be pieced together to determine their evidentiary value]; People v Clemente, 202 AD2d 302 [police entering apartment under exigent circumstances seized a drug ledger whose incriminating nature was not apparent until reviewed].) In none of those cases were police executing a warrant to search for and seize specified documents; they had no basis to conclude that various ledgers or papers had a potential incriminatory value. Since no documents were specified in those cases, the officers had no basis to undertake an inspection of documents to determine their incriminating nature.
Detective Serra was entitled to read through the "suicide note,” especially since his appreciation of its import was almost immediate and was only confirmed and enhanced as he proceeded. The detective recognized at first glance that the letter was written on police department memo paper, suggesting that Avila was the author; also immediately noticeable was the marking "11:30PM” and the name "Tina.” This led Detective Serra to believe that the note had been composed shortly before his arrival and was Avila’s reaction to his paramour’s likely arrest, since she failed to return home after engaging the supposed hit man. His suspicions were heightened by Avila’s attempts to snatch the document. Given these obvious *523 indicia of the note’s incriminating nature, Detective Serra was entitled to read further, to review the note’s contents, including the hostile reference to Ray, and to confirm the signature.
THE PURITIS ARREST PACKAGE
The evidentiary value of the Puritis arrest package was also immediately apparent. Detective Serra instantly recognized these as typical police department arrest documents and immediately concluded that this was the probable means by which defendant Shepard had identified Puritis as a candidate for the hit man position and learned where to find him.
Defendant Avila asserts that seizure of the Puritis package was. unlawful on the further ground that discovery of the package was not "inadvertent.” He argues, in other words, that because the officers should have anticipated and expected to find the papers relating to Puritis’ earlier arrest in Officer Avila’s apartment they were obliged to have included them in the search warrant; that since their discovery was not inadvertent, they were immune from seizure even though they were in plain view and their incriminatory nature was immediately apparent.
It is by no means clear that inadvertency is a requirement for a plain view seizure under New York law. In Horton v California (496 US 128, supra), the Supreme Court rejected inadvertence as a precondition for police officers who seize items which were not enumerated in a search warrant but which were in plain view. Although the New York Court of Appeals has cited Horton with approval in a case not involving a search warrant (People v Diaz, 81 NY2d 106, supra), some intermediate appellate courts have continued to adhere to an inadvertent discovery requirement. (See, People v McCullars, 174 AD2d 118 [3d Dept 1992]; People v Farmer, 198 AD2d 805 [4th Dept 1993]; but see, People v Manganaro, 176 AD2d 354 [2d Dept 1991].)
Even if inadvertent discovery is a requirement under New York law, it is readily satisfied in this case. The investigating officers had no inkling of how defendant Shepard found Puritis. Puritis had denied any knowledge of how Shepard came to him. And although the detectives knew that defendant Avila was a police officer, they were not aware of his earlier professional encounter with Puritis. Thus, Detective Serra could not reasonably have anticipated that the arrest package relating to Puritis would be found in Avila’s apartment and was not, therefore, required to include the documents in his search warrant application.
*524 Based on the foregoing, defendants’ motion to suppress the seized evidence is denied in its entirety.